

# THE ATTORNEY GENERAL
## OF TEXAS

JIM MATTOX
ATTORNEY GENERAL

December 27, 1990

Honorable Jimmie McCullough
County and District Attorney
82nd Judicial District
Robertson County
P. O. Box 409
Franklin, Texas    77856

Opinion No. JM-1274

Re: Authority of a sheriff to require his employees to submit to random drug testing (RQ-1952)

Dear Mr. McCullough:

You have requested our opinion regarding the authority of a sheriff's department to require its deputies and jailers to submit to random drug testing by means of urine samples.

Drug testing of governmental employees and others similarly situated has been the subject of frequent litigation in the federal courts in recent years, and no consensus has yet emerged on the permissible limitations which a governmental body may place on its employees' Fourth Amendment protection against unreasonable searches and seizures. In Skinner v. Railway Labor Executives' Ass'n, 109 S.Ct. 1402 (1989), the Supreme Court, in a 7-2 decision, upheld the Federal Railroad Administration regulations that required blood and urine tests for certain railroad employees following major train accidents or other "incidents." In National Treasury Employees Union v. Von Raab, 109 S.Ct. 1384 (1989), the Supreme Court, in a 5-4 decision, upheld urine testing of employees applying for promotion to positions involving interdiction of illegal drugs or requiring them to carry firearms. Neither of these Supreme Court decisions involved the kind of random urine testing for drugs about which you inquire. For purposes of this opinion, we assume that "random" testing refers to urinalysis that is not occasioned or triggered by any incident or event, such as alleged criminal activity, an accident, or a complaint filed by a member of the public that casts suspicion on one or a group of deputy sheriffs or jailers.

The lower federal appellate courts have considered random urine testing but are divided in their conclusions. In Penny v. Kennedy, 846 F.2d 1563 (6th Cir.), vacated, 862

F.2d 567 (6th Cir. 1988), the court of appeals for the sixth circuit invalidated the city of Chattanooga's mandatory urinalysis testing of police officers on a department-wide basis without reasonable cause or suspicion of individuals. By contrast, the court of appeals for the third circuit upheld random drug testing of police officers in the Township of Washington, New Jersey. Policeman's Benevolent Ass'n of New Jersey, Local 318 v. Township of Washington, 850 F.2d 133 (3rd Cir. 1988). Likewise, the court of appeals for the first circuit, in Guiney v. Roache, 873 F.2d 1557 (1st Cir.), cert. denied, 110 U.S. 404 (1989), upheld random drug testing by the Boston Police Department of all officers carrying firearms or participating in drug interdiction. See also Brown v. City of Detroit, 715 F.Supp. 832 (E.D. Mich. 1989); Weicks v. New Orleans Police Dep't, 706 F.Supp. 453 (E.D. La. 1988).

Although there seems to be a trend in the lower federal appellate courts to approve random urine testing of police officers, the Supreme Court has not yet upheld random testing of any kind, and the narrowness of the margin which the majority was able to muster in Von Raab does not inspire complete confidence that the Court will necessarily follow the rulings in Township of Washington and Guiney. We need not address the issue of random testing under the federal Constitution, however, since we believe that the Texas Constitution prohibits the practice.

In Texas State Employees Union v. Texas Dep't of Mental Health & Mental Retardation [hereafter TSEU], 746 S.W.2d 203 (Tex. 1987), the Texas Supreme Court affirmed the right of privacy under the Texas Constitution, as deriving, inter alia, from article I, section 9, which protects the right of an individual to be "secure . . . from all unreasonable seizures or searches," the same prohibition as appears in the Fourth Amendment to the federal Constitution. The court, declaring that the Texas Constitution protects one's personal privacy from unreasonable intrusion, held that the right of privacy can

> yield only when the government can demonstrate that an intrusion is reasonably warranted for the achievement of a compelling governmental objective that can be achieved by no less intrusive, more reasonable means.

Id. at 205.

In _TSEU_, the court said that a policy of the Department of Mental Health and Mental Retardation which required employees to submit to polygraph examinations in certain instances[1] was an unwarranted "intrusion" and therefore violative of the employee's right of privacy. The intrusiveness of urine testing is of a somewhat different nature from that of a polygraph examination, but in our opinion, the former is at least as intrusive as the latter. The chemical analysis of urine "can reveal a host of private medical facts about an employee, including whether she is epileptic, pregnant, or diabetic." _Skinner_, _supra_, at 1413. Furthermore, the very

> process of collecting the sample to be tested, which may in some cases involve visual or aural monitoring of the act of urination, itself implicates privacy interests.

_Id._ In concluding that urine testing "intrudes upon expectations of privacy that society has long recognized," the Court quoted the court of appeals for the fifth circuit in _National Treasury Employees Union v. Von Raab_, 816 F.2d 170, 175 (5th Cir. 1987):

> There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom.

_Skinner_, _supra_, at 1413.

---

1. Under the written policy, an employee could be dismissed for refusing to submit to a polygraph examination only if there existed reasonable cause to believe that (1) an incident of patient abuse or illegal on-campus activity had occurred; (2) an employee had violated departmental rules in connection therewith; and (3) all other reasonable investigatory alternatives had been exhausted including, at a minimum, an interview with the employee. In addition, there were restrictions on the administration of the examination itself.

We believe that the Texas Supreme Court would likewise conclude that the collection and testing of urine implicates privacy interests protected by the Texas Constitution, and that as a result, a governmental body, in order to require it, must pass the two-pronged test of TSEU: it must demonstrate that (1) the intrusion is warranted to achieve a compelling governmental objective; and (2) that objective cannot be achieved by less intrusive, more reasonable means.

In TSEU, the court found that the department's objectives were not sufficiently compelling to warrant the intrusion. The department's objectives were, however, quite specific:

> The polygraph testing was initiated to assist administrators in investigations of four types of situations: patient abuse or neglect; conduct endangering the health or safety of patients or other employees; theft or other criminal activity; use of drugs or alcohol.

TSEU, supra, at 206.

In the situation you pose, no objectives whatsoever have been stated. Since the polygraph examination in TSEU was struck down even when the goals of testing were specific, we believe that, at a minimum, a sheriff's department must have specific demonstrable goals that cannot be achieved by less intrusive, more reasonable means before it can constitutionally require urine testing. As the test you inquire about does not comply with either prong of the TSEU test, neither would it comply with article I, section 9, of the Texas Constitution.

## S U M M A R Y

The Texas constitutional guarantee of privacy would be violated by random urine testing of deputy sheriffs and jailers for the presence of drugs where no compelling governmental objective for the testing has been shown.

Very truly yours,

JIM MATTOX
Attorney General of Texas

MARY KELLER
First Assistant Attorney General

LOU MCCREARY
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RENEA HICKS
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Rick Gilpin
Assistant Attorney General